**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD LYNN BIBLE,
              *Petitioner-Appellant,*

v.

DORA SCHRIRO,
              *Respondent-Appellee.*

Nos. 07-99017,
11-16453,
11-71782

OPINION

Filed June 28, 2011

Before: Ronald M. Gould, Richard R. Clifton, and
Jay S. Bybee, Circuit Judges.

Per Curiam Opinion

---

**COUNSEL**

Daniel D. Maynard, Maynard Cronin Erickson Curran & Sparks, PLC, Phoenix, Arizona; Dale A. Baich, Assistant Federal Public Defender, Phoenix, Arizona; for the petitioner-appellant.

Jeffrey A. Zick, Assistant Attorney General, Phoenix, Arizona, for the respondent-appellee.

---

**OPINION**

PER CURIAM:

Richard Lynn Bible requests permission to file a second or successive application for a writ of habeas corpus in the District of Arizona. *See* 28 U.S.C. § 2244(b)(3). He also asks that we stay his execution, currently scheduled for June 30, 2011. We deny both requests.

**I**

Bible was convicted of first-degree murder, kidnapping, and molestation of a nine-year-old girl on April 12, 1990. He received a death sentence. Our opinion of July 1, 2009, not cited in the current application, details the circumstances of Bible's crimes and the evidence presented at his trial related to the murder:

> On June 6, 1988, around 10:30 a.m., the nine-year-old victim, Jennifer Wilson, began riding her bicycle to a ranch a mile away from where her family was

staying in Flagstaff, Arizona. Her family passed her while driving to the ranch, but Jennifer never arrived. The family began to look for her and discovered her bicycle by the side of the road. Within an hour of her disappearance, Jennifer's mother called the Flagstaff police to report her daughter missing. The Flagstaff police arrived and immediately called in a helicopter, set up roadblocks, and alerted the Federal Bureau of Investigation that Jennifer was missing. A massive police search ensued. But it was not successful.

Jennifer's mother told police that she saw a man driving a royal blue Blazer-type vehicle at a high rate of speed around the time her daughter went missing. Later that day, Bible arrived at his brother's home near Sheep Hill driving a dark green or silver Blazer-type vehicle. Believing that Bible had been stealing from him, Bible's brother called the police and described the vehicle. The detective who took Jennifer's mother's statement realized that her description of the "Blazer-type" vehicle and its driver substantially matched Bible and the vehicle described by Bible's brother. Police next discovered that Bible had stolen a GMC Jimmy from a police impound lot near Sheep Hill the day before. Later that evening, police saw Bible driving the stolen GMC vehicle. When police tried to stop Bible, a high-speed chase ensued. The police pursued Bible until he rammed the GMC vehicle into a cattle guard, ran from the vehicle, and hid in the woods. Police located Bible using a tracking dog. He was hiding under a ledge covered in twigs, leaves, and branches. Police confiscated a knife on Bible's person and a large folding knife where Bible was hiding. Within hours of his arrest and on the same day that Jennifer disappeared, Bible confessed to stealing

the GMC vehicle. Police held Bible without bail and confiscated his clothing.

In the stolen GMC, which had been used to deliver newspapers, police found a blanket, numerous round rubber bands but no rubber band bags, a piece of metal from the steering column that had been cut open, a case of twenty 50-milliliter bottles of "Suntory" vodka with two bottles missing, some packets of Carnation "Rich" hot chocolate, a wrapped cigar broken in two places, and a "Dutchmaster" cigar wrapper and band in the ashtray. There was blood smeared inside and under the vehicle, but testing did not reveal whether it was human blood.

For almost three weeks, Jennifer remained missing despite the massive yet fruitless search effort. Finally, hikers happened upon Jennifer's body on the top of Sheep Hill, not far from where she had been last seen. Jennifer's naked body was hidden under branches and debris near a tree, with her hands bound behind her back with a shoelace. Police secured the area and processed the evidence found in the vicinity of Jennifer's body. One of her sneakers was found without a shoelace near her body, and her panties were found in a nearby tree. The victim's head and genital area were severely decomposed, and she had multiple skull fractures and a broken jawbone indicating that blows to her head caused her death.

Around Jennifer's body lay distinctive items: an unwrapped, unsmoked cigar with two distinctive breaks in the same pattern as the cigar found in the GMC; an empty ten-pack box of Carnation "Rich" hot chocolate; two empty 50-milliliter "Suntory" vodka bottles; and a piece of metal that perfectly fit the GMC's damaged steering column. Round rubber

bands, identical to those found in the GMC, were everywhere—on a path near Jennifer's body, on and under her body, in the tree where her panties were found, near her other clothing, in the leaves covering her body, in the tree above her body, under a tree where one of her shoes was found, and in a rubber band bag sitting five feet from her body.

Near Jennifer's body, there were several clusters of long golden brown hair that were similar to her hair. Many of the hairs were cut on one side and torn on the other. The investigator was able to duplicate this pattern by using the knives found on Bible when he was arrested, as well as other knives. Mixed among the hair was a pubic-type hair that was similar to Bible's pubic hair samples. Hair similar to Bible's hair was also found on a sheet used to wrap Jennifer's body and on her t-shirt. The police found fibers on top of Sheep Hill that were similar to the GMC seat covers and the blanket found in the GMC. In addition, fibers found in a lock of hair near Jennifer's body were similar to fibers from Bible's jacket. A blue or purple fiber on the shoelace binding Jennifer's hands also matched the lining of Bible's jacket.

Several hairs on Bible's clothing were similar to Jennifer's hair and were also cut on one side and torn on the other. Police determined that hair found in the GMC was similar to Jennifer's hair. Blood on Bible's shirt matched Jennifer's PGM 2+ subtype— a subtype shared by less than three percent of the population. Bible has a PGM 1+ so the blood could not have been his subtype.

While still in jail for stealing the GMC, Bible was charged with first-degree murder, kidnapping, and child molestation. After a six-week trial, the jury found Bible guilty on April 12, 1990, of all charges.

*Bible v. Ryan*, 571 F.3d 860, 862-64 (9th Cir. 2009).

Bible's conviction and sentence were upheld on direct review, state collateral review, and federal habeas review. On March 22, 2010, the State of Arizona filed a motion in the Arizona Supreme Court for a warrant of execution. The Arizona Supreme Court granted the motion and issued a warrant of execution. A month later, on April 19, 2010, Bible filed a motion in state trial court for DNA testing of hairs used as inculpatory evidence at his trial. The trial court denied Bible's request, holding, first, that Bible did not establish that the evidence he sought to test still exists, and second, that there was not a reasonable probability that he would not have been convicted if exculpatory results had been obtained through DNA testing. The Arizona Supreme Court, on March 16, 2011, affirmed on the second ground. Two months later, on May 24, 2011, the Arizona Supreme Court denied Bible's motion for reconsideration. Bible petitioned the United States Supreme Court for a writ of certiorari to review the Arizona Supreme Court's decision and requested a stay of execution. The Supreme Court has not yet acted on Bible's petition or request for stay. Bible also filed a petition for special action in the Arizona Supreme Court seeking an order compelling the State to disclose information about the pentobarbital to be used in his execution and the qualifications of the person who will administer the drug. The Arizona Supreme Court declined to accept jurisdiction of the petition and denied a stay of execution on June 24, 2011.

On May 31, 2011, Bible filed a motion for substitution or association of counsel in the district court, which the district court denied the next day. Bible appealed on June 7, 2011. Construing the appeal as a motion in this court for association of counsel, we granted the motion on June 17, 2011, rendering the appeal moot. The Arizona Federal Public Defender entered an appearance as co-counsel.

On June 25, 2011, Bible filed an application for permission to file a second or successive habeas corpus petition, and two

separate motions for a stay of execution, in an effort to avoid the execution set for June 30, 2011.

## II

**[1]** Permitting a state prisoner to file a second or successive federal habeas corpus petition is not the general rule, it is the exception, and an exception that may be invoked only when the demanding standard set by Congress is met. Section 2244(b)(2) requires dismissal of a second or successive habeas corpus application unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B) (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). In other words, Bible must make a prima facie showing his claim (1) is based on newly discovered evidence and (2) establishes that he is actually innocent of the crimes alleged. *King v. Trujillo*, 638 F.3d 726, 729-30 (9th Cir. 2011) (per curiam).[1]

---

[1]"A prima facie showing is a sufficient showing of possible merit to warrant a fuller exploration by the district court, and we will grant an application for an SOS petition if it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition." *Landrigan v. Trujillo*, 623 F.3d 1253, 1257 n.6 (9th Cir. 2010) (quoting *Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997) (per curiam)) (internal quotation marks omitted).

## A

**[2]** To make the first prima facie showing—that the applicant's claim is based on newly discovered evidence—Bible "must show that the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." *Landrigan v. Trujillo*, 623 F.3d 1253, 1256 (9th Cir. 2010). In *Landrigan*, we doubted that the applicant was diligent where he waited six years to request DNA testing after the state adopted a statute permitting such testing. *See id.* ("In these circumstances a serious question exists whether the factual predicate for the claim—results of DNA testing [on trial evidence]—could not have been discovered earlier."). Bible's long-delayed and virtually last minute application raises similar doubts. Bible waited until April 19, 2010, ten years after the enactment of Arizona's DNA testing statute, Ariz. Rev. Stat. § 13-4240, before filing a motion in Arizona state court requesting DNA testing of inculpatory hair evidence presented at trial. His motion came only after the State moved in the Arizona Supreme Court for a warrant of execution. Bible's counsel attributes the delay in seeking DNA testing to changes in Bible's defense team, complexity of the record, and his focus on other avenues of appeal. But the statute requires that the factual predicate for the testing request "could not have been discovered previously through the exercise of due diligence," § 2244(b)(2), and the circumstances of this case do not meet this demanding standard.

## B

To make the second prima facie showing—that the applicant is actually innocent of the crimes alleged—Bible must show that "no reasonable factfinder would have found [him] guilty of the underlying offense." § 2244(b)(2). Bible has made no such showing.

Bible argues that DNA testing of the hair evidence would exonerate him. The second or successive habeas petition that

he seeks to file asserts that Arizona's denial of his request for DNA testing violated due process. Bible sought testing of (a) hair found on and around the victim, which was matched to Bible at trial; (b) hair found on Bible's jacket, shirt, in his wallet, and on a blanket in his car, which was matched to the victim at trial. Bible maintains that DNA testing would reveal that the hairs taken from his clothes and car are not the victim's, and that the hairs found on or near the victim are not his. Such evidence, Bible claims, would "go[ ] a long way toward exonerating him or at least showing that someone else was involved" and that if hairs found on the victim "are from a known sex offender, surely this would exonerate Bible."

**[3]** Bible's argument is unpersuasive. Whatever the DNA testing of the hair evidence might reveal, it could not refute the overwhelming inculpatory evidence presented at Bible's trial. In deciding Bible's direct appeal, the Arizona Supreme Court commented that the "evidence in this case goes far beyond overwhelming evidence of guilt. It is not only inconsistent with any reasonable hypothesis of innocence, it refutes any hypothesis other than Defendant's guilt." *State v. Bible*, 858 P.2d 1152, 1192 (Ariz. 1993). This assessment of the evidence holds true even absent the forensic hair evidence presented at trial: Bible had been driving a stolen car that substantially matched the description of a car seen speeding near the location where the victim was last seen; Bible evaded police officers when they tried to apprehend him, at first leading police on a high-speed chase that ended only when he ran his car into a cattle guard, stopping it, and then fleeing on foot before being caught; distinctive items discovered at the location where the victim's body was found matched items in Bible's car, including round rubber bands, a particular brand of hot chocolate, a particular type of vodka bottle, and a piece of metal that matched metal missing from the steering column of Bible's car; the victim's hair had been cut and torn using a tool consistent with knives that Bible was carrying when arrested; fibers matching Bible's jacket were found near the victim's body; and, most critically, blood matching the vic-

tim's PGM 2+ subtype—a subtype shared by less than three percent of the population—was found on Bible's shirt, in a blood spatter pattern consistent with beating force.[2] In light of this overwhelming evidence, we cannot say that, absent the forensic hair evidence presented at Bible's trial, "no reasonable factfinder would have found [Bible] guilty of the underlying offense." § 2244(b)(2).

Furthermore, Bible overstates what DNA testing results favorable to him could have established. DNA testing that revealed the presence of hairs belonging to another individual on or around the victim, or on Bible, would not be strongly suggestive of innocence. Bible stole the car used to transport the victim's body, so hair belonging to the car's owner or a previous passenger might be found on the sheet wrapped around the victim's body, on the victim, or on Bible. It would also not be surprising to find that the hairs belong to other individuals who came into contact with Bible or the victim in the days before the crime. In short, the presence of someone else's hair would neither explain nor diminish the overwhelming evidence of guilt.

**[4]** Bible speculates that DNA testing might show the presence of hair belonging to a known sex offender at the crime scene. But Bible does not support such speculation with any theory of innocence. Any convicted person, no matter how compelling the evidence against him or her, could argue that DNA testing is necessary to rule out the unsubstantiated possibility that someone else committed the crime. Granting an application to file a second or successive habeas petition on this sort of speculation is not consistent with the requirement of § 2244(b)(2) that the applicant show actual innocence.

---

[2]Bible's reply brief says that he "dispute[d] th[e blood] evidence on direct appeal and it was excluded." But the only blood-related evidence challenged and excluded was DNA probability evidence. Test results showing that the blood on Bible's shirt was the same subtype as the victim's blood was neither challenged on appeal nor excluded. *Bible*, 858 P.2d at 1192.

### III

**[5]** Petitioner-Appellant has filed two motions to stay execution. The first is a motion to stay pending disposition of this application, which we deny as moot. The second is a motion to stay in light of the recent appointment of the Arizona Federal Public Defender as associated co-counsel. We granted Petitioner-Appellant's motion for association of co-counsel to assist Daniel D. Maynard, Bible's principal attorney, in any pre-execution filings, but we made no determination, and we do not believe, that associated co-counsel was necessary for effective representation. *See* 18 U.S.C. § 3599(d) (providing that appointment of co-counsel is permitted "for good cause"). Our aim in appointing the Arizona Federal Public Defender was to permit supplementation of legal advice, not to substitute counsel. Mr. Maynard has been competently representing Petitioner-Appellant since November 23, 2005, and, in recent months, has zealously sought relief on Bible's behalf before numerous federal and state courts. Mr. Maynard, as Bible's former and continuing counsel, is well-acquainted with the complex record in this case, and the Arizona Federal Public Defender, while new to this case, is well-acquainted with the legal issues. Because Bible's prior counsel remains on the case, the recent addition of new counsel does not deny the "meaningful assistance of counsel," *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 813 (9th Cir. 2003), contemplated by § 3599. In the circumstances of this case, a stay is not needed for Bible to have competent assistance of counsel, and the further delay from a stay would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades. We decline to grant a stay of execution.

### IV

We conclude that Bible's claims do not satisfy the requirements of § 2244(b)(2). Bible's Application for Permission to

File a Second or Successive Habeas Corpus Petition is DENIED.

Bible's Application for a Stay of Execution pending consideration of his application in No. 11-71782 is DENIED AS MOOT.

Bible's Motion to Stay Execution in No. 11-16453 is DENIED.

No petition for rehearing or motion for reconsideration shall be filed or entertained in this case. *See* 28 U.S.C. § 2244(b)(3)(E).

**APPLICATION DENIED. REQUESTS FOR STAY DENIED.**