**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GERALD ROSS PIZZUTO, Jr.,
                              *Petitioner,*

            v.

RANDY BLADES,
                              *Respondent.*

No. 11-70623

OPINION

Application to File Second or Successive
Petition Under 28 U.S.C. § 2255

Filed March 8, 2012

Before: Betty B. Fletcher, Ronald M. Gould, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge B. Fletcher

## COUNSEL

Joan M. Fisher, Office of Federal Defender for the Eastern District of California, Capital Habeas Unit, Sacramento, California, for the petitioner.

L. LaMont Anderson, Office of the Idaho Attorney General, Boise, Idaho, for the respondent.

## OPINION

GOULD, Circuit Judge:

Gerald Ross Pizzuto, Jr., requests permission to file a second or successive application for a writ of habeas corpus in the District of Idaho. *See* 28 U.S.C. § 2244(b)(3)(A).

## I

Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery,

and one count of grand theft on March 27, 1986. He was sentenced to death for the murders of Berta Louise Herndon and her nephew, Delbert Dean Herndon, on May 23, 1986. Our opinion of February 6, 2002 details the circumstances of Pizzuto's crimes and the evidence presented at his trial:

> On July 25, 1985, Berta Herndon and her adult nephew Delbert Herndon were robbed and murdered and their property was stolen while they were camping in the Ruby Meadows area, a remote campsite near McCall, Idaho. The police discovered their bodies in shallow graves that had been dug near their cabin. The victims' hands were bound behind their backs with shoelaces and heavy wire, and Berta's and Delbert's jeans were pulled below their knees. The murders occurred in the Herndon cabin.

> Both the Idaho Supreme Court and the district court's order denying Pizzuto's petition for writ of habeas corpus describe the facts in detail. In sum, testimony at trial showed that Pizzuto, James Rice, and William and Lene Odom knew each other from Orland, California. They (along with the Odoms' two children) traveled to Idaho in the Odoms' vehicle, and were camping together that day in a cabin in the Ruby Meadows area. William Odom and Pizzuto discussed robbing two fishermen, Stephen Crawford and Jack Roberts. While they were at the pond, the Herndons drove by in their pickup truck. Pizzuto and Odom abandoned their plan to rob the fishermen, and returned to their cabin. Shortly thereafter, Pizzuto left the others and walked off in the direction the Herndons had driven. He picked up a .22 caliber rifle and said he was going "hunting."

> Twenty to thirty minutes later, Rice and Odom drove up the road in Odom's truck looking for Pizzuto. As they drove past the Herndon cabin, they saw Pizzuto

standing in the doorway, holding a revolver. Pizzuto came up to Rice and Odom and told them to "give me half an hour and then come back up." Rice and Odom drove back to their cabin, left their truck, and walked back to the Herndon cabin.

Approaching the Herndon cabin, Rice and Odom heard "bashing hollow sounds" like a watermelon being thumped. Pizzuto emerged with a hammer, the rifle, a revolver, and a pair of cowboy boots. He also had a "wad of hundred dollar bills" that he gave to Odom; Rice took the rifle. Pizzuto told them that he had "put those people to sleep, permanently." He also said that he told the Herndons that he was a "highwayman" and that, when Delbert Herndon didn't believe him, Pizzuto put a gun up to Delbert's face, "made him drop his pants and crawl around the cabin," and asked Delbert: "Does this look like a cannon from where you are standing at?"

Rice then heard some snoring sounds coming from the cabin and went inside. There, he found Berta and Delbert lying on the ground, with blood on their heads. Both bodies were still, except for Delbert Herndon's legs which were shaking. Rice shot Delbert Herndon in the head because he "didn't want him to suffer."

Pizzuto, Rice, and Odom returned to their camp, divided up the money Pizzuto had stolen from the Herndons, and gave Lene Odom a leftover $ 100 bill. Pizzuto and Odom then went back to the Herndon cabin to bury the bodies. At the cabin, Odom saw that the Herndons' hands were tied behind their backs. They buried Berta Herndon in a hole that Rice had previously dug. Pizzuto and Odom got Rice to help them bury Delbert Herndon; they threw his body in a shallow ditch and covered it with dirt.

After they returned to their cabin, Pizzuto, the Odoms, and Rice sorted through the Herndons' possessions and took what they wanted. They left Ruby Meadows with Odom driving his truck and Pizzuto and Rice riding in the Herndon truck. They camped that evening at a nearby hot springs; the next morning they parked the Herndon truck in a wooded area, drove into Cascade and checked into a motel. They stayed there for several days and, while there, took pictures of each other with a camera stolen from the Herndons. Rice then took a bus to Orland, where he reported the murders to the police.

On July 31, Pizzuto met Roger Bacon in Gold Fork Hot Springs. Bacon and Pizzuto decided to go fishing and hunting. As they walked toward a small stream, Pizzuto pulled out a gun and said "he was a highwayman." Pizzuto tied Bacon's hands behind his head with shoelaces, took money from him, and left him tied to a tree. Bacon eventually freed himself.

Sometime in early August Pizzuto visited his sister, Angelinna Pizzuto, in Great Falls, Montana. Pizzuto arrived with cowboy boots, a revolver, and a two-tone gold wedding band in his possession, all of which were subsequently identified as belonging to Delbert Herndon. Pizzuto told her that he was a "highwayman" and that he had robbed and murdered a man and a woman (with the man's gun, which he had) after he had tied them to some trees. Later, Pizzuto told his sister that he had not killed the man but Rice had; later still, that Rice and Odom had killed the people and he, Pizzuto, had freaked out, had a seizure, and tied a guy to a tree.

Autopsies revealed that Berta Herndon and Delbert Herndon each suffered two fatal blows to the head,

consistent with hammer blows, and in addition that Delbert Herndon had been shot between the eyes which would also be fatal. The pathologist was unable to determine which occurred first. Delbert Herndon's wrists had been bound with a shoe lace and a piece of wire, and Berta Herndon's hands and wrists were tied behind her back using a shoe lace which was wrapped several times around her right thumb.

Pizzuto, Rice and the Odoms were charged with the Herndon murders; Rice and Odom pled guilty to lesser offenses and charges against Lene Odom were dismissed in exchange for their agreeing to testify at Pizzuto's trial.

Following a jury trial Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery, and one count of grand theft on March 27, 1986. The trial judge, Hon. George C. Reinhardt, ordered that a presentence report be completed and that psychiatric examinations be conducted by Dr. Michael Emery and Dr. Roger White. Pizzuto declined to meet with Dr. White on advice of counsel. During the sentencing hearing before Judge Reinhardt, convened May 21, 1986, Pizzuto called his two sisters, Toni and Angelinna Pizzuto, and his aunt, Kibby Winslow, who described the abuse he (and his sisters) suffered in childhood; his former probation officer from Great Falls, Montana, Jerome Skiba, who gave a positive report on Pizzuto's adjustment; and Dr. Emery. Pizzuto did not testify but made an unsworn statement to the court. The state presented eight witnesses, including Pizzuto's former wife, Pamela Relken, who testified that Pizzuto could be "very violent, punishing" in that he had pushed her head into a wall, drowned her cats and their puppy (who

Pizzuto then hung from the shower stall), pushed her down the stairs when she was six-and-a-half months pregnant, pointed a gun at her head and played roulette, described himself "as a fourth generation Al Capone," and threatened her with death in a letter written after he had been arrested on rape charges. It also called Michael Berro, the presentence investigator on Pizzuto's Michigan rape conviction, who testified that Pizzuto was "one of two people who have ever threatened [his] life where [he] believed it"; Paul Blumbaum, who worked at Pizzuto's jail and testified that Pizzuto claimed to have put snakes in mailboxes, said that he could "get anything out of anybody he wanted by the technique of tying them tightly around the ankles," and threatened his jailers by saying that he was going to bring in the Mafia; Annette Jones, who authored the presentence report for the Herndon case; Bert[a] Herndon's widower; and Dr. Emery.

On May 23, 1986 Judge Reinhardt sentenced Pizzuto to a fourteen-year fixed term with no possibility of parole for grand theft and a fixed life term for robbery. On the murder charges, the judge found that the mitigating circumstances did not outweigh any one of five statutory aggravating circumstances as would make imposition of the death penalty unjust. Accordingly, he sentenced Pizzuto to death for the murders of Delbert Herndon and Berta Herndon.

*Pizzuto v. Arave*, 280 F.3d 949, 952-54 (9th Cir. 2002).

Pizzuto's conviction and sentence were upheld on direct review. On state collateral review, the Idaho Supreme Court vacated Pizzuto's robbery conviction, concluding it merged as a lesser-included offense of felony-murder. Pizzuto's other convictions and his sentence were upheld on state collateral review and federal habeas corpus review.

On March 2, 2011, Pizzuto filed a motion to file a successive habeas corpus petition challenging his conviction and sentence. He alleges seven claims—two claims of prosecutorial misconduct, one claim of judicial misconduct, one claim of judicial bias, a claim of actual innocence, a claim of cumulative error, and a claim that Idaho unconstitutionally fails to provide a post-conviction procedure with means of adequately reviewing constitutional claims in capital cases, as applied to Pizzuto—based on evidence previously unavailable.

## II

**[1]** Section 2244(b)(2) of the Antiterrorism and Effective Death Penalty Act ("AEDPA") requires dismissal of a second or successive habeas corpus application unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B) (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

**[2]** "Permitting a state prisoner to file a second or successive federal habeas corpus petition is not the general rule, it is the exception, and an exception that may be invoked only when the demanding standard set by Congress is met." *Bible*

*v. Schriro*, 651 F.3d 1060, 1063 (9th Cir. 2011) (per curiam). To the extent that Pizzuto raises claims not previously presented, he must make a prima facie showing that his application satisfies the requirements of § 2244(b). § 2244(b)(3)(C); *King v. Trujillo*, 638 F.3d 726, 729 (9th Cir. 2011) (per curiam). In other words, Pizzuto must "make a prima facie showing to us that his claim (1) is based on newly discovered evidence and (2) establishes that he is actually innocent of the crimes alleged." *King*, 638 F.3d at 729-30.

## A

**[3]** We turn first to Pizzuto's claim of judicial bias. Pizzuto claims that he is entitled to file a successive motion under § 2244(b)(2) because of new facts related to judicial misconduct in his trial and sentence of death. However, in his first federal habeas corpus petition Pizzuto made a claim of judicial bias against Judge Reinhardt, and we determined that he procedurally defaulted the claim because he was unable to show cause for not raising it in his first petition for post-conviction relief in state court. *Pizzuto*, 280 F.3d at 974-75. A claim presented in a second or successive application under § 2254 that was presented in a prior application "shall" be dismissed. § 2244(b)(1); *Tyler v. Cain*, 533 U.S. 656, 661 (2001) (in the context of a second or successive habeas application, noting that "[i]f the prisoner asserts a claim that he has already presented in a previous federal habeas petition, the claim must be dismissed in all cases"). It is only where a petitioner asserts a new claim that § 2244(b)(2) applies. *Id.*

**[4]** "[T]he dismissal of a first petition with prejudice because of a procedural default (and a failure to show cause and prejudice) forecloses the possibility that the underlying claims will be addressed by a federal court . . . . Such a dismissal therefore constitutes a disposition on the merits and renders a subsequent petition second or successive for purposes of 28 U.S.C. § 2244(b)." *McNabb v. Yates*, 576 F.3d 1028, 1029 (9th Cir. 2009) (citing *Henderson v. Lampert*, 396

F.3d 1049, 1053 (2005)). Pizzuto claimed judicial bias, relying, in part, on the same evidence that he presents here, that Judge Reinhardt made public statements of his intent to impose the death penalty before the sentencing hearing. *Pizzuto*, 280 F.3d at 974. He also introduces new evidence that supports his claim of judicial bias. However, federal courts "will not consider new factual grounds in support of the same legal claim that was previously presented." *Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999). Therefore, Pizzuto's application to file a second or successive application for habeas corpus relief regarding judicial bias must be denied.[1]

**B**

We turn next to Pizzuto's other claims related to his conviction and conclude that he is unable to meet the high standards of § 2244(b)(2)(B). To be able to file a second or successive habeas petition, Pizzuto must show that he is actually innocent—that "no reasonable factfinder would have found [Pizzuto] guilty of the underlying offense." § 2244(b)(2). Even accepting as true Pizzuto's factual allegations, Pizzuto has made no such showing.

Pizzuto presents the following newly discovered evidence: (1) the testimony of James Rice, one of the prosecution's witnesses, was negotiated before the trial in a meeting with the prosecutor, the trial and sentencing judge, and the appointed counsel of Rice; (2) James Rice perjured himself when he testified regarding the promises he received in exchange for his testimony; (3) the prosecutor and judge knew the testimony was perjured and did nothing to correct or prevent it; (4) the

---

[1]Pizzuto's claim of judicial misconduct (relating to the trial judge's participation in orchestrating Rice's testimony) is sufficiently different from the claim of judicial bias (relating to the trial judge's predisposition to impose the death penalty) he presented in his first federal habeas petition that it is not barred as a claim presented in a prior application. § 2244(b)(2).

judge and county sheriff coordinated physical evidence to corroborate the version of events to which Rice testified; (5) the judge and sheriff maintained a relationship that likely resulted in fabrication of evidence—namely the presence of blood and a shell casing in the cabin even though prior searches of the cabin had failed to reveal such evidence. Pizzuto also relies on an affidavit by his sister Angelinna stating that during her testimony she was drunk and on drugs provided by the prosecution and that the prosecutor had told her how to testify.

**[5]** If true, these allegations raise troubling issues about Pizzuto's trial. However, without minimizing those allegations, we must follow AEDPA's "extremely stringent" requirements. *Greenawalt v. Stewart*, 105 F.3d 1268, 1277 (9th Cir. 1997). The question is not whether this jury, knowing of this prosecutorial and judicial misconduct would have acquitted Pizzuto, but whether, "in light of the evidence as a whole . . . no reasonable factfinder would have found [Pizzuto] guilty." § 2244(b)(2).

**[6]** Even if we credit Pizzuto's claim that "[n]o reasonable juror . . . would have found Rice credible, had the newly discovered evidence been available and presented at trial," and even if we discount Angelinna's testimony, other unchallenged evidence provides a sufficient basis on which a reasonable factfinder could find Pizzuto guilty of murdering the Herndons. Though the testimony of Rice and Angelinna was part of the government's case, the prosecution did not rest solely on this testimony. William and Lene Odom's and Roger Bacon's testimony, forensic evidence, and the fact that Delbert Herndon's belongings were found with Pizzuto are sufficient to support a finding of guilt.

Lene Odom testified that Pizzuto went camping with her family and Rice and that she overheard the three men discussing robbing two fishermen. She also testified that, after the men decided not to do so because one of the fishermen had a gun, Pizzuto took the gun they had brought with them and

went off in the direction of the Herndons' pickup and that Odom and Rice followed about an hour later. Later, Pizzuto drove the Herndons' pickup back to the cabin the Odoms, Rice, and Pizzuto were using, and the three men divided up money.

Odom testified that Pizzuto came out of the Herndons' cabin with a hammer in his hand, and that he reported to Odom that he had told "the guy and lady that he was a highwayman" and that he "put those people to sleep permanently." Carl Koenen, who performed the autopsies, testified that both of the Herndons' injuries were caused by something small and dense, like a hammer. Though Rice admitted to shooting Delbert in the head, Koenen testified that Delbert had three fatal injuries—crushing fractures on the right and left sides of his head and the gunshot wound—any of which were individually fatal. He further testified that both Herndons were found with their wrists tied behind their backs with shoelaces.

Sheriff Baldwin testified that he went to Great Falls, Montana to pick up Pizzuto and transport him back to the state of Idaho. Sheriff Baldwin also picked up evidence—including a pistol, a ring, and boots. Joe Herndon, Delbert Herndon's brother, testified that those items belonged to Delbert.

Bacon's description of the manner in which Pizzuto robbed him was similar to Pizzuto's robbery of the Herndons. During both robberies Pizzuto described himself as a "highwayman." Bacon testified that Pizzuto tied his hands with shoelaces in a manner similar to that in which the Herndons' hands were tied. Both the binding in shoelaces and the use of the term "highwayman" are not so commonplace as to suggest that a reasonable factfinder could not have thought Pizzuto committed the murders. Instead, a reasonable factfinder could think that such evidence helped to prove guilt of the murders beyond a reasonable doubt.

**[7]** Even if the testimony of Rice and Angelinna were completely removed from consideration, there was very

strong evidence of guilt: Pizzuto had Delbert Herndon's belongings. He tied Bacon up with shoelaces in a similar manner as the Herndons had been tied, calling himself a "highwayman" in both cases. Odom testified that Pizzuto claimed to "put those people to sleep permanently." Both victims had deadly blows to the head consistent with being caused by a hammer, and Odom saw Pizzuto with a hammer. Considering the weight of this other evidence, we conclude that Pizzuto has not shown by clear and convincing evidence that no reasonable factfinder would have found him guilty as required by § 2244(b)(2)(B)(ii).

## C

[8] Section 2244(b)(2) applies not only to the underlying conviction but also to the imposition of the death penalty. *Thompson v. Calderon*, 151 F.3d 918, 923 (9th Cir. 1998). To succeed, Pizzuto has to establish by "clear and convincing evidence that . . . no reasonable factfinder would have found [him] guilty" of the aggravating factors used to sentence him to death. § 2244(b)(2)(B)(ii). "A claim of actual innocence of the death penalty would require a showing that one of the statutory aggravators or other requirements for the imposition of the death penalty had not been met." *Beaty v. Schriro*, 554 F.3d 780, 784 (9th Cir. 2009). Mitigating factors are not taken into consideration. *Id.*; *see also Sawyer v. Whitley*, 505 U.S. 333, 344-345 (1992).

[9] Under Idaho law at the time of Pizzuto's sentencing, if the sentencing judge found one of eleven statutory aggravating circumstances to have been established beyond a reasonable doubt, he was required to impose a sentence of death unless he found that mitigating factors outweighed the aggravating factors. IDAHO CODE § 19-2515 (1986).

> Judge Reinhardt found five statutory aggravating circumstances beyond a reasonable doubt: (1) at the time Pizzuto murdered Delbert Herndon, he also

murdered Berta Herndon; (2) the murders were especially heinous, atrocious, cruel and manifested exceptional depravity; (3) by the murders and circumstances surrounding their commission, Pizzuto exhibited utter disregard for human life; (4) the murders were accompanied with the specific intent to cause the two deaths; and (5) by prior conduct and by conduct in the murders in this case, Pizzuto had exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

*Pizzuto*, 280 F.3d at 957.

**[10]** Pizzuto cannot get past the first statutory aggravating circumstance found by Judge Reinhardt—that at the time he murdered Delbert Herndon, he also murdered Berta Herndon. As discussed above, he has not presented enough evidence to show with clear and convincing evidence that no reasonable factfinder would have found him guilty of committing both murders. Therefore, he cannot show actual innocence of the death penalty because any one of the aggravating factors were individually sufficient to support the sentence.

## D

Because we conclude that Pizzuto does not satisfy the requirements of the second prong of § 2244(b)(2)(B), that he show actual innocence of the underlying crime or of the aggravating factors used to impose the death penalty, we need not, and do not, address prong one: whether he has shown due diligence. *See Babbitt*, 177 F.3d at 747 (denying the second or successive application for failure to meet the due diligence prong and noting that the actual innocence prong need not be addressed).

## III

**[11]** We hold that Pizzuto's claims do not satisfy the requirements of § 2244(b)(2). Pizzuto's Motion to File Successive Petition for Writ of Habeas Corpus is DENIED.

**MOTION DENIED.**

---

B. FLETCHER, Circuit Judge, dissenting:

I dissent. We should grant Pizzuto's motion to file a second or successive application for a writ of habeas corpus pursuant to 28 U.S.C. § 2244(b)(2)(B). Pizzuto raises serious claims of judicial and prosecutorial misconduct that were not presented in his prior habeas applications. The factual predicate for these claims was revealed only in 2005 by Pizzuto's co-defendant and could not have been discovered previously even through the exercise of due diligence. Pizzuto's claims, if proved, will establish such pervasive misconduct that no reasonable factfinder would have found Pizzuto guilty of the underlying offense. He should be afforded the opportunity to present these claims in an application for a writ of habeas corpus.

I am shocked by the conduct in this case. Nothing can be more disturbing to a judge than a conviction and death sentence obtained by a corrupt prosecutor colluding with a corrupt judge. The State asks us to deny Pizzuto an opportunity to challenge just such a conviction and sentence. The majority is willing to do just that. But no fair legal system — and certainly not our American legal system — should allow a conviction and death sentence based in part on perjured testimony procured by the collusion of the judge, the prosecutor, and counsel for Pizzuto's co-defendant.

As the majority recognizes, the heart of Pizzuto's claim is that the testimony of James Rice, one of the prosecution's key witnesses, was negotiated before the trial during ex parte meetings among the prosecutor, the judge who presided over Pizzuto's trial and sentencing (as well as Rice's guilty plea and sentencing), and Rice's counsel. Both Rice and Pizzuto (along with William and Lene Odom) were originally charged

with the murders of Berta and Delbert Herndon. Rice and
William Odom pleaded guilty to lesser offenses, and charges
against Lene Odom were dropped, in exchange for their
agreement to testify against Pizzuto.

At Pizzuto's trial in 1986, Rice testified that in exchange
for his testimony he would be spared the death penalty but
still would face the possibility of life in prison. In September
2005 — long after Pizzuto's conviction was final and his first
habeas petition had been denied — Rice stated, for the first
time, that he had been promised a sentence of twenty years in
exchange for his testimony against Pizzuto, and that he was
assured he would actually serve only fourteen years, eight
months, and sixteen days of that sentence. Immediately after
Rice revealed this information, Pizzuto's counsel located
Rice's ex-wife, who corroborated Rice's affidavit. Rice's ex-
wife explained that:

> I communicated with Jim [Rice] until he was sen-
> tenced. He told me about making a deal where he
> would plead guilty and testify against Jerry [Pizzuto]
> in exchange for a lower sentence. Jim knew prior to
> his sentencing hearing that he was going to be sen-
> tenced to twenty years, and that he would actually
> serve less than that with good behavior. . . . I am cer-
> tain that Jim knew what his sentence was going to be
> prior to the sentencing hearing.

Seeking further corroboration of these statements, Pizzuto's
lawyers obtained the files and billing records of Rice's coun-
sel. Those files revealed something even more troubling than
Rice's false trial testimony about what he received in
exchange for his guilty plea: the fact that Judge George Rein-
hardt participated in negotiating Rice's testimony and plea
deal. Judge Reinhardt was the judge who presided over Rice's
guilty plea, Pizzuto's trial, and Pizzuto's sentencing.

The billing records of Rice's counsel showed that on Janu-
ary 9, 1986, Rice's counsel received a phone call from Judge

Reinhardt. The next entry, on January 13, is described as two hours of "serious consultations and negotiations for plea-bargaining conference with the prosecutor." Then, after consulting with Rice about the proposed plea bargain, on January 16 there is an entry for three hours described as "[c]onference at Crossroads [a local restaurant] *with Judge Reinhardt, prosecutor on plea agreement.*" Notes from the files of Rice's counsel confirmed that they had met with Judge Reinhardt and the prosecutor at 6:00 a.m. on January 16 at the Crossroads restaurant. The notes also described the meeting as "discussed negotiations for Rice to enter plea to reduced charges" and noted that "certain questions [were] raised by the Judge" regarding Rice's version of the murders.

A week later, on January 23, Judge Reinhardt took Rice's guilty plea. Throughout the plea colloquy, Judge Reinhardt never disclosed his involvement in the negotiations. According to the affidavits of Rice and his ex-wife, before the plea hearing Rice's attorneys had assured him that they had a close relationship with Judge Reinhardt and the prosecutor, and that they had promised that if Rice pleaded guilty he would be sentenced to twenty years and would actually serve only fourteen years, eight months, and sixteen days. Rice claims that at the same time his lawyers made these assurances, they instructed him to say "no" at the plea colloquy when asked if he had been promised a certain sentence and to say "yes" when asked if he understood that he could receive a life sentence. When Rice testified against Pizzuto, he told the jury that he was facing a possible sentence of life in prison. During closing argument, the prosecutor cited that possible sentence as evidence of Rice's credibility: "Jim Rice pled guilty to two counts of second degree murder. . . . Jim Rice expects, and he told you from the witness stand, that he may spend the rest of his natural life in prison. Got a great deal, didn't he?"

The majority opinion recognizes, as it must, that these facts form the basis of Pizzuto's claims that the judge committed misconduct by helping to negotiate Rice's guilty plea and

what Rice's testimony would be at trial; that the judge and prosecutor committed further misconduct by failing to disclose to Pizzuto's counsel Rice's plea bargain and the judge's involvement in it; and that Rice committed perjury at Pizzuto's trial, condoned by the judge and prosecutor, when he testified that he expected a possible life sentence. Whether Rice also perjured himself concerning the circumstances of the murder we know not. Pizzuto also presents an affidavit from his sister Angelinna stating that the prosecutor and sheriff provided her with alcohol and drugs in exchange for her testimony and that her testimony was coached by the prosecutor.

The majority concludes that Pizzuto should not be allowed to present these claims in a second or successive habeas petition because, even accepting Pizzuto's factual allegations as true, Pizzuto cannot show that "no reasonable factfinder would have found [him] guilty of the underlying offense," as required by 28 U.S.C. § 2244(b)(2). I respectfully disagree with this conclusion.

Despite the existence of other evidence against Pizzuto, knowledge of the misconduct by the prosecutor and the judge would have undermined any reasonable jury's faith in the entirety of the prosecution's case. "Providing an accused with the right to be tried by a jury of his peers [gives] him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). Any reasonable jury would have fulfilled this role as a safeguard had it known that: (1) the supposedly impartial judge had in fact colluded with the prosecutor in securing Rice's testimony to help convict Pizzuto; (2) the judge and prosecutor promised Rice a particular sentence before his guilty plea; (3) the judge and prosecutor allowed Rice to perjure himself regarding his plea bargain; and (4) the prosecutor and sheriff coached Angelinna to testify and exploited her drug and alcohol addictions.

It is unfortunate that the shocking facts of this case were not uncovered sooner. But fortunate, indeed, that they were

eventually uncovered, even though they come to us in the form of a request to bring a second or successive habeas petition. We should rejoice in a system that allows a second habeas challenge when diligent counsel is able to uncover the facts and present them to us before a man is put to death.

When faced with the corruption of our legal system, we must start over. The first step is to allow Pizzuto to file a second petition for habeas corpus in the district court. Nothing more nor less is required of us. I dissent from the majority's refusal to take that first step.