**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAVID GULBRANDSON,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Arizona
Department of Corrections,
*Respondent-Appellee*.

No. 07-99012

D.C. No.
CV-98-02024-
PHX-SMM

---

DAVID GULBRANDSON,
*Petitioner*,

v.

CHARLES L. RYAN,
*Respondent*.

No. 09-72779

D.C. No.
CV-98-2024-
PHX-SMM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted
June 14, 2012—San Francisco, California

Filed March 18, 2013
Amended October 28, 2013

Before: Dorothy W. Nelson, Johnnie B. Rawlinson, and
Sandra S. Ikuta, Circuit Judges.

Order;
Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent
by Judge D.W. Nelson

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition by an Arizona state prisoner challenging his conviction and capital sentence for murder, and denied his request to file a second or successive petition.

The panel first held that the state court's denial of petitioner's claim, that defense counsel provided ineffective assistance by failing to call petitioner as a guilt-stage witness, was not an objectively unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), when counsel could have reasonably concluded that petitioner's testimony would have harmed the defense because it could have alienated petitioner in the jury's eyes.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next held that the state court's denial of petitioner's claim, that counsel was ineffective by failing to recall his expert at sentencing to testify about petitioner's state of mind at the time of the crime, also was not objectively unreasonable when such an opinion was cumulative of evidence from that witness that was already before the sentencing court.

The panel also held that petitioner's claim, that counsel was ineffective by failing to recall the expert at sentencing to testify about the potential for rehabilitation, was procedurally barred because it was not fairly presented to the state court.

The panel held that petitioner was not entitled to an evidentiary hearing. The panel explained that, because the above state court determinations were neither contrary to, nor involved unreasonable applications, of federal law, the district court was barred from any further factual development of those claims.

The panel held that petitioner was not entitled to relief as to his claim that the trial judge considered victim impact evidence from the victim's family members during sentencing in violation of the Eighth Amendment, because there is no Supreme Court case squarely addressing the issue of whether a judge (as opposed to a jury) is barred from considering such evidence.

The panel denied petitioner's request for authorization to file a second or successive § 2254 petition, because petitioner did not demonstrate either due diligence or actual innocence as to his claims that were not presented in his first state habeas petition.

Judge D.W. Nelson concurred in part, but dissented because she would hold that the state court unreasonably determined the facts in denying petitioner's claim that defense counsel should have called an expert to testify about petitioner's state of mind, and would remand for an evidentiary hearing.

## COUNSEL

Timothy M. Gabrielsen (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender, Federal Public Defender's Office, Tucson, Arizona; Stephen E. Eberhardt, Tinley Park, Illinois, for Petitioner-Appellant.

Susanne Bartlett Blomo (argued), Assistant Attorney General; Thomas C. Horne, Attorney General; Jeffrey A. Zick, Chief Counsel, Arizona Attorney General's Office, Capital Litigation Section, Phoenix, Arizona, for Respondents-Appellees.

## ORDER

The opinion and dissent filed on March 18, 2013, are amended. The superseding amended opinion and dissent will be filed concurrently with this order.

With these amendments, a majority of the panel has voted to deny appellant's petition for panel rehearing. Judge Nelson would grant the petition. Judge Rawlinson and Judge Ikuta voted to deny the petition for rehearing en banc. Judge Nelson recommended granting it. The petition for rehearing en banc was circulated to the judges of the court, and no

judge requested a vote for en banc consideration. The petition for rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for rehearing or petitions for rehearing en banc will be entertained.

**OPINION**

IKUTA, Circuit Judge:

David Gulbrandson is an Arizona capital prisoner who appeals from the denial of his first habeas petition and also seeks authorization to file a second or successive habeas petition. We affirm the district court's denial of Gulbrandson's first petition and deny his request to file a second or successive petition.

I

A

Gulbrandson and Irene Katuran were partners in a Phoenix-based photography business called Memory Makers. For about a year, during 1990, they were also romantically involved. This relationship ended in January 1991, when Irene began seeing another man. When their personal relationship deteriorated, the business relationship soured as well, and Gulbrandson began suspecting that Irene was trying to buy him out of Memory Makers. *State v. Gulbrandson*, 906 P.2d 579, 586 (Ariz. 1995).

This tension reached a high point on Valentine's Day 1991. Gulbrandson became intoxicated and argued with

Irene in the presence of two friends, Sally and Charles Maio. Gulbrandson then tried to strangle Irene and had to be pulled off by Charles Maio. Later that night, Gulbrandson told the Maios, "I'm going to kill her [Irene]. I'm going to kill the business. I'm going to kill everything."

Around one month later on the morning of March 11, 1991, Irene was found dead in her house. Gulbrandson had come over the night before and the two had another fight about the business. According to Gulbrandson, at some point during the argument Irene threw a pair of scissors at him, after which he snapped. The Arizona Supreme Court described the resulting crime as follows:

> Irene was killed brutally. The police found her face down dressed in only a pair of panties with her legs bent up behind her at the knee and her ankles tied together by an electrical cord attached to a curling iron. Her right wrist was bound with an electrical cord attached to a hair dryer. Her bedroom was covered in what appeared to be blood. From the bedroom to the bathroom were what appeared to be drag marks in blood. Clumps of her hair were in the bedroom; some of the hair had been cut, some burned, and some pulled out by the roots.
>
> Four knives and a pair of scissors were in the kitchen sink and appeared to have blood on them; hair appeared to be on at least one of the knives. There also was what appeared to be blood on a paper towel holder in the kitchen; a burnt paper towel was in Irene's

bedroom. A Coke can with what appeared to be a bloody fingerprint on it was on the kitchen counter; this fingerprint was later identified as defendant's. At trial, the state's criminalist testified that the knives, scissors, paper towel holder, and Coke can had human blood on them, although the police did not determine the blood type. Defendant's fingerprints were found on the paper towel holder and on an arcadia door at Irene's home, which was open in the family room the morning after the crime. A blood-soaked night shirt with holes in it was in Irene's bedroom; the blood on the nightshirt was consistent with Irene's blood type. A banker's bag was also in her bedroom with what appeared to be blood on it.

The autopsy revealed that Irene suffered at least 34 sharp-force injuries (stab wounds and slicing wounds), puncture wounds, and many blunt force injuries. The most serious stab wound punctured her liver, which alone was a fatal injury. Her nose was broken, as were 2 ribs on the back of the chest and 5 ribs in front on the same side of her trunk. The tine from a wooden salad fork was embedded in her leg; a broken wooden fork was found in the bedroom. On her left buttock was an abrasion that appeared to be from the heel of a shoe. The thyroid cartilage in front of her neck was fractured, which could have been caused by squeezing or by impact with a blunt object. She died from the multiple stab

> wounds and the blunt neck injury. The neck
> injury may have resulted in asphyxiation. The
> pathologist believed that most, if not all, of
> the injuries were inflicted before death.

*Gulbrandson*, 906 P.2d at 586–87.

Following the murder, Gulbrandson stole Irene's car and drove it to Laughlin, Nevada, where he gambled at a hotel casino. Some time later, Gulbrandson traveled to Montana, where he was arrested on April 3, 1991. *Id.* at 587–88.

Two weeks later, Gulbrandson was indicted for first-degree murder and theft. *Id.* at 588. He presented the defenses of insanity and lack of premeditation. At the time, Arizona used the so-called *M'Naghten* test for insanity, which was statutorily codified as follows:

> A person is not responsible for criminal
> conduct by reason of insanity if at the time of
> such conduct the person was suffering from
> such a mental disease or defect as not to know
> the nature and quality of the act or, if such
> person did know, that such person did not
> know that what he was doing was wrong.

Ariz. Rev. Stat. § 13-502 (1991).[1]

The State refuted Gulbrandson's defenses with expert testimony from Dr. Alexander Don and Dr. John Scialli, who

---

[1] Unless otherwise indicated, all citations to Arizona statutes will be to the 1991 version of the law, which was the law at the time of Gulbrandson's trial.

both performed psychiatric evaluations on Gulbrandson. Dr. Don testified that he found "no indications that [Gulbrandson] suffered with a mental illness or defect at the time of the commission of the crime," and there was "no reason to doubt that his awareness of what he was doing and the wrongfulness of what he was doing was unimpaired." Dr. Scialli corroborated Dr. Don's testimony regarding Gulbrandson's sanity.

Gulbrandson relied on a psychiatric expert named Dr. Martin Blinder, who examined Gulbrandson in August 1992 and prepared a report detailing his conclusions ("1992 report"). Dr. Blinder's report provided four specific diagnoses for Gulbrandson: "[p]robable dissociative episode [and] possible fugue state," "[b]ipolar disorder," "[a]lcoholism," and "[p]ersonality disorder, primarily narcissistic, with antisocial traits." Although Dr. Blinder's report provided specific diagnoses for Gulbrandson, it did not state that Gulbrandson was legally insane at the time of the murder.

At the pre-trial hearing, the state moved to limit expert testimony on Gulbrandson's state of mind to a general description of his personality. The state argued that neither the state nor defense experts, including Dr. Blinder, were prepared to opine that Gulbrandson was insane, and in such circumstances, Arizona law precluded any testimony about the defendant's mental state at the time of the murder. *See State v. McMurtrey*, 664 P.2d 637, 664 (Ariz. 1983) (in banc) ("In cases not involving an insanity defense, a psychiatric expert witness ordinarily may not give an opinion concerning the defendant's state of mind at the time of the crime."). In response, defense counsel stated that he intended to raise an insanity defense, as well as argue an absence of intent. He

noted that Dr. Blinder had examined Gulbrandson in order "to determine if, in fact, he was *M'Naghten* insane at the time of the event," and that he "would expect" that Dr. Blinder's "testimony would relate to that."[2]  The court stated it would take the issue under advisement.

Gulbrandson did not testify at the guilt stage of the trial and, instead, relied on Dr. Blinder's testimony.  Dr. Blinder described Gulbrandson's psychiatric background as a "long adult history of alcoholism and mental illness, primarily depressive moods with marked mood swings and blackout spells."  He also testified as to his four specific diagnoses for Gulbrandson.

Dr. Blinder did not testify that these mental defects rendered Gulbrandson legally insane.  As a result, the trial court ruled that Dr. Blinder could not testify directly about Gulbrandson's mental state at the time of the murder. Nevertheless, the court allowed Dr. Blinder to present his opinions regarding Gulbrandson's mental state at the time of the murder indirectly through hypothetical discussions of how an individual with Gulbrandson's exact diagnoses might have reacted when faced with circumstances like the ones Gulbrandson encountered the night he killed Irene.  For example, when asked about how Gulbrandson would react "in

---

[2] The dissent is thus mistaken in identifying a contradiction between (1) defense counsel's statement to the trial court that "Dr. Blinder examined Gulbrandson to determine if, in fact, he was *M'Naghten* insane at the time of the event" and (2) defense counsel's "1997 declaration that Dr. Blinder . . . was unwilling to render an opinion that Gulbrandson was *M'Naghten* insane at the time of the murder."  Dis. op. at 48.  In fact, at no time did the defense counsel state that Dr. Blinder would offer a *M'Naghten* insanity defense.  Even Gulbrandson acknowledges that defense counsel "was non-committal as to whether Dr. Blinder would testify to insanity."

a situation where he was under a high degree of stress and there was a quarrel or argument and an object was thrown at him," Dr. Blinder responded that Gulbrandson "disassociates, goes out of control, loses his ability to think rationally, [and] just acts in a destructive violent fashion." In other words, Gulbrandson would "[t]une out consciousness and operate like a robot, a violent out-of-control robot." Dr. Blinder also acknowledged that, given Gulbrandson's mental health history, "a quarrel coupled with . . . some physical provocation" would "set the stage for gratuitous violence," and that "such action or reaction . . . might result reflexively rather than with any thought process."

The jury convicted Gulbrandson of premeditated first-degree murder and theft of property having a value of at least $8,000. *Gulbrandson*, 906 P.2d at 588.

## B

Pursuant to Arizona law at the time, the judge held a pre-sentencing hearing to determine whether aggravating and mitigating circumstances were present. Ariz. Rev. Stat. § 13-703(B) (1991), *invalidated by Ring v. Arizona*, 536 U.S. 584 (2002). A death sentence must be supported by one or more of ten statutorily enumerated aggravating circumstances, § 13-703(E), (F), including the circumstance that the defendant "committed the offense in an especially heinous, cruel or depraved manner," § 13-703(F)(6). The Arizona Supreme Court has identified five factors to consider in determining whether a murder was especially heinous, cruel or depraved: (1) relishing the murder, (2) infliction of gratuitous violence, (3) needless mutilation of the victim, (4) senselessness of the crime, and (5) helplessness of the

victim. *State v. Gretzler*, 659 P.2d 1, 11–12 (Ariz. 1983) (in banc).

If the requisite aggravating circumstance is proven, the judge must next decide whether there are "mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat.§ 13-702(E). "Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." § 13-703(G). The statute sets forth a nonexclusive list of such circumstances, including:

> 1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.
>
> 2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.

§ 13-703(G)(1), (2).

In addition to the evidence submitted by the parties at sentencing, the judge must also consider any "[e]vidence admitted at the trial, relating to such aggravating or mitigating circumstances," even if that evidence is not reintroduced at the sentencing proceeding. § 13-703(C).

At the pre-sentencing hearing and in its sentencing memorandum, the State argued that the evidence presented at

trial demonstrated the aggravating circumstance that Gulbrandson "committed the offense in an especially heinous, cruel or depraved manner." § 13-703(F)(6).

Gulbrandson, in turn, advanced a number of statutory and non-statutory mitigating circumstances. First, Gulbrandson argued that his capacity to conform his conduct was significantly impaired by his mental illnesses, § 13-703(G)(1), and that he was facing unusual stress at the time of the murder, § 13-703(G)(2). Gulbrandson also raised four non-statutory mitigating circumstances: his character and behavioral disorders, his difficult childhood, his good behavior while incarcerated, and his potential for rehabilitation. Among other things, Gulbrandson's counsel presented Dr. Blinder's 1992 report in support of these mitigating circumstances. Gulbrandson also gave a prepared statement.

On February 19, 1993, the judge held a second sentencing hearing. In the presentencing report filed in anticipation of this hearing, Irene's parents and two daughters all stated that they would like to see Gulbrandson receive the death penalty. These statements were reiterated at the hearing, where one of Irene's daughters testified that she wanted to "see [Gulbrandson] killed. . . . [and] tortured the way he tortured my mom," and Irene's father stated that he believed "[Gulbrandson] should be executed as promptly as possible." At the conclusion of this second hearing, the judge found that Gulbrandson had relished the murder, inflicted gratuitous violence, and that Irene was a helpless victim. Therefore, he concluded that the State had proven beyond a reasonable doubt the aggravating circumstance that Gulbrandson killed Irene in an "especially heinous and depraved manner."

As for statutory mitigation, the judge held that Gulbrandson failed to prove that his capacity to conform his conduct was impaired, Ariz. Rev. Stat. § 13-703(G)(1), but that he did show he was under unusual stress, § 13-703(G)(2). *Gulbrandson*, 906 P.2d at 588–89. The judge also found a variety of non-statutory mitigating circumstances, namely, that Gulbrandson had character and behavior disorders, a difficult childhood, and had behaved well while in jail. However, the judge determined that the mitigating circumstances were not sufficiently substantial to justify leniency. He sentenced Gulbrandson to death.

C

On direct review, the Arizona Supreme Court affirmed the trial court's findings of gratuitous violence and victim helplessness, but reversed the finding that Gulbrandson relished the murder. *Gulbrandson*, 906 P.2d at 601–02. In considering the statutory mitigating factors, the court affirmed the trial court's determination that Gulbrandson had not proved the (G)(1) statutory mitigating factor, noting that the testimony of Dr. Don and Dr. Scialli "supports the trial court's finding that the (G)(1) circumstance was not established," because "both testified that defendant appreciated the nature of his acts and could conform his conduct to the requirements of the law." *Id.* at 602. After conducting an independent reweighing of the mitigating and aggravating circumstances, it upheld the death sentence, concluding that "this was a particularly gruesome, brutal, and protracted killing." *Id.* at 604. The court also denied Gulbrandson's claim that his Eighth Amendment rights were violated because impermissible victim impact testimony from Irene's family members was presented to the sentencing judge. *Id*. at 598–99.

In April 1997, Gulbrandson filed a petition for post-conviction relief in state court asserting, among other things, various claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Relevant here, he argued that defense counsel provided constitutionally ineffective assistance when he failed to (1) call Gulbrandson as a witness during the guilt stage of trial, (2) elicit an insanity opinion from Dr. Blinder, and (3) recall Dr. Blinder at sentencing to testify about Gulbrandson's state of mind during the murder. In support of the first claim, Gulbrandson submitted an affidavit explaining that he would have testified about his psychiatric history as well as his recollection of the night of the murder.

Gulbrandson based the latter two claims on an affidavit from Dr. Blinder ("1997 affidavit"), which stated that Dr. Blinder had been prepared at the time of trial to testify as to certain conclusions. These conclusions included: that Gulbrandson was suffering from certain mental disabilities (the same disabilities that were listed in Dr. Blinder's 1992 report);[3] that Gulbrandson had suffered from these disabilities for a number of years before the murder; that Irene's throwing the scissors had "triggered his narcissistic rage, causing him to act with lethal force;" and that "at the time of this rage, he was suffering from the mental illnesses described above and that would significantly affect his ability to appreciate the nature and quality of his acts or to understand right from wrong." The 1997 affidavit also

---

[3] Dr. Blinder's 1997 affidavit states he was prepared at the time of trial to testify that Gulbrandson was suffering from mental disabilities, "including (i) probable disassociative episode, possible fugue state; (ii) bipolar disorder; (iii) alcoholism, in part related to diagnosis (ii); [and] (iv) personality disorder, primarily narcissistic, with antisocial traits."

expressed Dr. Blinder's professional opinion that
Gulbrandson's "condition is treatable and that it is very
probable that he can be rehabilitated," although it did not
indicate that Dr. Blinder would have made that statement at
the 1992 trial.

The state post-conviction court denied the petition. As to
Gulbrandson's first claim, it held that counsel's decision not
to call Gulbrandson as a witness was reasonable under the
circumstances and, moreover, that Gulbrandson failed to
demonstrate that he was prejudiced by this alleged omission.
With respect to the second claim, it held that counsel behaved
reasonably by not obtaining an insanity opinion because Dr.
Blinder was not willing to offer such an opinion at the time of
trial.

The court rejected the third claim, that counsel was
ineffective for failing to recall Dr. Blinder at sentencing,
under both prongs of *Strickland*.  With respect to the
deficiency prong, the court held that defense counsel's
performance was reasonable in light of the circumstances at
the time.  Specifically, counsel had ensured that Dr. Blinder's
opinions were before the sentencing court by submitting Dr.
Blinder's written report and by presenting Dr. Blinder's
testimony at trial, which, by statute, meant that counsel did
not need to resubmit the testimony at sentencing.  Moreover,
at the time of trial, defense counsel was under the impression
that Dr. Blinder would not render opinions other than those
contained in his testimony and his report.  As to *Strickland*'s
prejudice prong, the court determined that there was "no
reasonable probability that the sentence imposed by this
Court would have been different if counsel had presented, at
the sentencing hearing, the opinions set forth in Dr. Blinder's

[1997] affidavit." The Arizona Supreme Court declined further review.

In May 1999, Gulbrandson filed a habeas petition in the District of Arizona. The district court denied all of Gulbrandson's claims and also denied his "general request[]" for an evidentiary hearing because a hearing was "neither warranted nor required." In February 2009, a motions panel of this court granted a certificate of appealability that included all of Gulbrandson's claims now before us.

On appeal, Gulbrandson argues that the state post-conviction court unreasonably applied *Strickland* to deny him relief based on counsel's alleged failures to call Gulbrandson as a guilt-stage witness and to recall Dr. Blinder at sentencing to testify about Gulbrandson's state of mind at the time he murdered Irene. He also asserts, for the first time in any proceedings, that defense counsel was ineffective for failing to recall Dr. Blinder at sentencing to testify about Gulbrandson's potential for rehabilitation. Further, Gulbrandson argues that the district court abused its discretion in denying him an evidentiary hearing on these ineffective assistance claims, as well as his claim that counsel was deficient for failing to obtain an insanity opinion from Dr. Blinder. Finally, he argues that the Arizona Supreme Court's denial of his Eighth Amendment claim was an objectively unreasonable application of clearly established Supreme Court precedent.

In addition to this direct appeal of his first habeas petition, Gulbrandson also seeks leave to file a second or successive habeas petition alleging new claims based on a recently obtained expert report.

II

A

We review de novo the district court's denial of a habeas petition. *Fairbank v. Ayers*, 650 F.3d 1243, 1250 (9th Cir. 2011). A district court's decision to deny an evidentiary hearing is reviewed for abuse of discretion. *Id*. at 1251.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to Gulbrandson's petition, which was filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997). Under 28 U.S.C. § 2254(d), habeas relief can be granted only if the state court proceeding adjudicating the claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Under § 2254(d)(1), "[t]he pivotal question is whether the state court's application" of the Supreme Court precedent "was unreasonable," *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), as opposed to merely "incorrect or erroneous," *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an *incorrect* application of federal law."). In applying this standard, "a habeas court must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of this Court." *Harrington*, 131 S. Ct. at 786.

AEDPA demands similar deference to a state court's factual findings under § 2254(d)(2). "[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). For a factual finding to be "actually unreasonable," we must conclude that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000. Similarly, a state court's fact-finding process is unreasonable under § 2254(d)(2) only if we are "satisfied that *any* appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* (emphasis added).

A state court need not conduct an evidentiary hearing to resolve every disputed factual question. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). Indeed, "[a] state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Id.* As always, the "ultimate question is whether an appellate court would be *unreasonable* in holding that an evidentiary hearing was not necessary in light of the state court record." *Id.* (emphasis in original).

B

The clearly established federal law for ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668, which held that the Sixth Amendment guarantees effective assistance of counsel at trial and at capital sentencing proceedings resembling trials. *Id.* at 687–88. To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687.

Counsel is constitutionally deficient if the representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted). "Judicial scrutiny of counsel's performance must be highly deferential," and we must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. Instead, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see also Harrington v. Richter*, 131 S. Ct. 770, 789 (2011). Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did."

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Harrington*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 696). That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," *id.*, has the defendant met *Strickland*'s demand that defense errors were "so serious as to deprive the defendant of a fair trial," *id.* at 787–88 (quoting *Strickland*, 466 U.S. at 687).

Under AEDPA, we do not apply the *Strickland* standard de novo. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 131 S. Ct. at 785. "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Deference to a state court's determination that counsel's performance was not deficient requires us to ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. Deference to a state court's conclusion that any deficiency did not result in prejudice requires us to ask whether such a determination by the state court "would be unreasonable." *Premo v. Moore*, 131 S. Ct. 733, 744 (2011);

*see also Harrington*, 131 S. Ct. at 792 (holding that "[i]t would not have been unreasonable" for the state court to conclude that the petitioner's evidence of prejudice did not make it "reasonably likely" that the result would have been different).

We apply this deferential standard to review the state court's "last reasoned decision." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). Here, the last reasoned decision addressing Gulbrandson's various ineffective assistance of counsel claims is that of the Arizona trial court on state post-conviction review.

C

We begin by considering Gulbrandson's argument that the state court unreasonably denied him relief under *Strickland* for his claim that defense counsel was ineffective because he failed to call Gulbrandson as a guilt-stage witness. The state court held that counsel's decision not to call Gulbrandson was reasonable under the circumstances. This was not an objectively unreasonable application of *Strickland*.

As set forth in his post-conviction affidavit, had Gulbrandson testified, he would have testified about, among other things, his history of psychiatric problems and his recollection of the events leading up to the crime. In addition, he "intended to carefully explain" how he discovered that Irene was going to "deprive me of the fruits of my labor behind my back" after "I started and developed my business through hard work and sacrifice." He would also have told the jury that when he arrived at Irene's house the night of the murder, she was "argumentative, hostile and disrespectful to me."

Defense counsel could have reasonably concluded that Gulbrandson's testimony would have harmed the defense because it could have "alienated him in the eyes of the jury." *Bell v. Cone*, 535 U.S. 685, 700 (2002). Gulbrandson's suggestions in his post-conviction affidavit that the murder was a justifiable response to Irene's actions towards Gulbrandson would likely have been negatively received by the jury. *See Burger v. Kemp*, 483 U.S. 776, 791–92 (1987) (holding that an attorney reasonably determined that "it would be unwise to put [defendant] on the witness stand" because the "record indicates that [defendant] had never expressed any remorse about his crime" and thus the "jury might regard [defendant's] attitude on the witness stand as indifferent or worse."). Gulbrandson confirmed that he would be an unsympathetic witness in his sentencing allocution, where he derided the prosecutor as "unethical and ambitious," the trial as a "sham and a mockery of the judicial system," and the "despicable representation" by his various appointed attorneys as "ill-investigated, ill-prepared, [and] ill-presented."

Accordingly, the state court reasonably concluded that "counsel's representation was within the wide range of reasonable professional assistance," *Harrington*, 131 S. Ct. at 787 (internal quotation marks omitted), when he decided not to call Gulbrandson as a guilt-stage witness, *see id.* at 789–90 ("An attorney need not pursue an investigation that . . . might be harmful to the defense."). There is no basis under AEDPA to hold that this was an objectively unreasonable application of *Strickland*.

## D

We next consider Gulbrandson's claim that counsel was ineffective in failing to recall Dr. Blinder, at sentencing, to testify about Gulbrandson's state of mind at the time of the murder. According to Gulbrandson, had trial counsel done so, Dr. Blinder's testimony would have established that Gulbrandson lacked the cognitive ability to inflict "gratuitous" violence, one of the factors relevant to whether Gulbrandson met the (F)(6) aggravating circumstance, *Gretzler*, 659 P.2d at 11, and that Gulbrandson met the (G)(1) mitigating circumstance, which requires a defendant to establish that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." § 13-703(G)(1). Applying AEDPA's deferential standard of review, we conclude that the state post-conviction court did not apply *Strickland* unreasonably in rejecting this claim.[4] *See* 28 U.S.C. § 2254(d)(1).

Under AEDPA, we are "doubly deferential" to the state court's resolution of Gulbrandson's *Strickland* claim. *Pinholster*, 131 S. Ct. at 1403 (internal quotation marks omitted). In order to satisfy *Strickland*'s prejudice prong, Gulbrandson must demonstrate "a reasonable probability"

---

[4] Although the state post-conviction court did not expressly reference the (G)(1) mitigating circumstance and the (F)(6) aggravating circumstance, its determination that the sentencing court had "the whole of Dr. Blinder's opinions" at the time of sentencing, and that there was no reasonable probability that its sentence would have been different if counsel had introduced the opinions set forth in Doctor Blinder's 1997 affidavit, disposed of Gulbrandson's arguments with respect to both these statutory provisions.

that, but for the claimed error, "the result of the proceeding would have been different." *Premo*, 131 S. Ct. at 739 (internal quotation marks omitted). But it is not our task to determine whether Gulbrandson has made such a showing; rather, AEDPA requires us to ask whether the state post-conviction court was reasonable in determining that Gulbrandson was not prejudiced. *Id.* at 744. We must uphold the state court's decision if "fairminded jurists could disagree" as to whether it was correct. *Harrington*, 131 S. Ct. at 786 (internal quotation marks omitted).

Applying this standard, we conclude that the state post-conviction court reasonably determined that Gulbrandson was not prejudiced by counsel's decision not to recall Dr. Blinder. As the court noted, counsel had already adequately apprised the sentencing court of Dr. Blinder's opinions regarding Gulbrandson's state of mind at the time of the murder by eliciting Dr. Blinder's testimony at trial and by submitting Dr. Blinder 1992 report to the court. This evidence was part of the sentencing record by operation of law. *See* Ariz. Rev. Stat. § 13-703(C). Because the opinions set forth in Dr. Blinder's 1997 affidavit were cumulative of the evidence that was already before the sentencing court, it was not unreasonable for the state post-conviction court to conclude that these opinions would not have made a difference at sentencing. *See Wong v. Belmontes*, 130 S. Ct. 383, 387–88 (2009) (holding that the failure to present cumulative mitigation evidence at sentencing did not prejudice the defendant).

The cumulative nature of the 1997 affidavit is readily apparent. The 1997 affidavit confirms that Dr. Blinder would have given the same mental illness diagnoses of Gulbrandson in 1997 as he gave in 1992. It also confirms that Dr. Blinder

would have provided a description of Gulbrandson's mental state at the time of the murder that was essentially the same as the testimony adduced at trial. For instance, the 1997 affidavit states that Gulbrandson "acted in a rage, impulsively and without reflection and was unable to conform his conduct to societal norms because of his mental disability," and that Gulbrandson's disorders "would [have] significantly affect[ed] his ability to appreciate the nature and quality of his acts or to understand right from wrong." The 1992 trial testimony communicates the same conclusion: that Gulbrandson's capacity to control and conform his conduct at the time of the murder was greatly diminished. To that effect, Dr. Blinder explained that "in a situation where [Gulbrandson] was under a high degree of stress and there was a quarrel or argument and an object was thrown at him," he "dissociates, goes out of control, loses his ability to think rationally, [and] acts in a destructive violent fashion . . . . like a robot, a violent out-of-control robot." Dr. Blinder also agreed with counsel that Gulbrandson, when faced with the exact circumstances he encountered the night he killed Irene, would undertake gratuitously violent acts "reflexively rather than with any thought process." Likewise, Dr. Blinder's 1992 report, which was also before the sentencing court, states that Gulbrandson experienced a "narcissistic rage . . . just prior to the homicide," and that his "glaring failure to take even the most basic steps to cover his tracks . . . is a measure of his degree of psychological disability *at the time of the offense*."

In short, both the 1997 affidavit and the evidence adduced in 1992, if credited, could have established that Gulbrandson's capacity to control and conform his conduct at the time of the murder was greatly diminished, which would support Gulbrandson's claims that he lacked the cognitive ability to inflict "gratuitous" violence for purposes

of the (F)(6) aggravating circumstance, and that he met the (G)(1) mitigating circumstance. Although Dr. Blinder's statement in his 1997 affidavit tracks the language of the mitigation statute more closely than does his 1992 testimony, the state post-conviction court could reasonably have concluded that there was no "reasonable probability" that Gulbrandson would have received a different sentence even if counsel had presented, at the sentencing hearing, the rephrased testimony set forth in Dr. Blinder's 1997 affidavit. *Premo*, 131 S. Ct. at 744.[5]

Because the state court reasonably held that trial counsel's failure to recall Dr. Blinder at sentencing did not result in prejudice to Gulbrandson, we need not reach the state court's determination that such failure was not deficient. *See Strickland*, 466 U.S. at 697 (holding that "a court deciding an ineffective assistance claim" need not "address both components of the inquiry").

The dissent argues that the state post-conviction court unreasonably determined the facts by not holding an evidentiary hearing before rejecting Gulbrandson's *Strickland*

---

[5] The dissent accuses us of engaging in "post-hoc analysis" in concluding that Dr. Blinder's 1997 affidavit is cumulative of his 1992 testimony. Dis. op. at 44 n.1. But in making this criticism, the dissent loses sight of our standard of review. Under *Strickland*, Gulbrandson bore the burden of showing the state court that he had suffered prejudice from trial counsel's error because, (1) the opinions in Dr. Blinder's 1997 affidavit were materially different from the opinions already before the state court, and (2) these new opinions would have made a difference. The state court held that Gulbrandson did not meet that burden. Our task is merely to determine whether that ruling was an unreasonable application of *Strickland*. We compare Dr. Blinder's 1997 affidavit and 1992 testimony simply to confirm the reasonableness of the state court's decision.

claim. Dis. op. at 47–49. We disagree. Here the state court assumed that Dr. Blinder would have provided the opinions from his 1997 declaration at sentencing, but still rejected Gulbrandson's *Strickland* claim. A state court need not hold an evidentiary hearing when it would not afford relief even assuming the defendant's allegations were true. *See Hibbler*, 693 F.3d at 1147–48 (holding that a state court need not "conduct an evidentiary hearing to resolve every disputed factual question" and that an evidentiary hearing is unnecessary where the record precludes relief); *Perez v. Rosario*, 459 F.3d 943, 951 (9th Cir. 2006) ("Where there is no likelihood that an evidentiary hearing would have affected the determination of the state court, its failure to hold one does not make such determination unreasonable.").

Accordingly, we conclude that the state court neither unreasonably applied *Strickland* nor unreasonably determined the facts when it determined that Gulbrandson was not prejudiced by defense counsel's decision not to recall Dr. Blinder.

E

We turn next to Gulbrandson's claim for ineffective assistance of counsel based on defense counsel's failure to recall Dr. Blinder at sentencing to testify about Gulbrandson's potential for rehabilitation. The factual underpinning for this claim is also Dr. Blinder's 1997 affidavit, which states that Gulbrandson's "condition is treatable and that it is very probable that he can be rehabilitated, learn to control and conform his behavior, manage the psychological deficits created by his illnesses and be rehabilitated while in institutional custody." Because this evidence was potentially mitigating, *see State v. Finch*,

68 P.3d 123, 126 (Ariz. 2003), Gulbrandson asserts that defense counsel was ineffective for failing to develop it, and that the state court unreasonably held to the contrary. The State argues that this claim is procedurally barred. We agree.

A federal court may not grant a habeas petition unless the petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(b)(1)(A). A federal claim is exhausted if it "has been fairly presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971). If the claim was never fairly presented, we nevertheless deem the claim technically exhausted if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *see also id.* at 732. If this predicted default of the federal claim in state court would be based on "an independent and adequate state procedural rule," that claim is procedurally barred in federal court unless the petitioner can excuse the default by showing cause and prejudice or a fundamental miscarriage of justice. *Id.* at 750.

In order to "fairly present" an issue to a state court, a petitioner must "present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief." *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009). As a general matter, each "unrelated alleged instance[] of counsel's ineffectiveness" is a separate claim for purposes of exhaustion. *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005). In *Moormann*, for example, we held that petitioner's claim that "counsel was ineffective for failing to investigate and present a viable defense" did not fairly present the more specific claim that counsel was ineffective

in "presenting the insanity defense." *Id*. Thus, we recognized that while a petitioner who "presented a particular claim" would not be barred from later "develop[ing] additional facts supporting that particular claim," it did not mean that "a petitioner who presented any ineffective assistance of counsel claim below can later add unrelated alleged instances of counsel's ineffectiveness to [that] claim." *Id.* at 1056; *see also Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (en banc) (holding that an ineffective assistance claim for failure to vigorously cross-examine a witness did not exhaust ineffective assistance claims directed to other independent omissions by counsel).

*Moorman* guides our analysis here. Before the state post-conviction court and state supreme court, Gulbrandson's only claim for ineffective assistance relating to Dr. Blinder's testimony at sentencing was that counsel was ineffective for not presenting Dr. Blinder's opinions about Gulbrandson's state of mind at the time of the crime, as stated in Dr. Blinder's 1997 affidavit. Gulbrandson did not mention in his state court briefing that defense counsel was also ineffective for failing to present Dr. Blinder's testimony on rehabilitation. In fact, Gulbrandson did not raise this "unrelated alleged instance[] of counsel's ineffectiveness," *Moorman*, 426 F.3d at 1056, until his opening brief to this court.

Gulbrandson nevertheless argues that he placed the state court on notice of this specific ineffective assistance claim because it arises from Dr. Blinder's same 1997 affidavit that supports Gulbrandson's other ineffective assistance claim related to Dr. Blinder's sentencing testimony. In other words, he argues that the claim was fairly presented in state court solely because the necessary facts were placed before the

court. But the mere submission of a relevant affidavit to a state court is not sufficient to place that court on notice of all potential constitutional challenges stemming from that affidavit. *See Koerner v. Grigas*, 328 F.3d 1039, 1046–48 (9th Cir. 2003). In *Koerner*, we held that even though the factual basis for a claim was submitted to the state court, the claim itself had not been fairly presented to the court because the facts were used exclusively to support another claim. *Id.* Thus, we made clear that a petitioner does not exhaust all possible claims stemming from a common set of facts merely by raising one specific claim.

Accordingly, we conclude that Gulbrandson failed to present to the state courts his ineffective assistance claim based on counsel's failure to recall Dr. Blinder at sentencing to testify about Gulbrandson's potential for rehabilitation. If he were to do so now, the claim would be procedurally barred because he failed to raise it "in [a] previous collateral proceeding." Ariz. R. Crim. P. 32.2(a)(3). Because this rule provides an independent and adequate state basis for denying relief, *see Stewart v. Smith*, 536 U.S. 856, 859–61 (2002), and Gulbrandson does not argue that his state default can be otherwise excused through a showing of cause and prejudice, this claim is procedurally barred.

III

Gulbrandson also argues that the district court abused its discretion by denying him an evidentiary hearing on all the previously analyzed ineffective assistance claims as well as his claim that defense counsel was ineffective because he failed to elicit an insanity opinion from Dr. Blinder.

We consider Gulbrandson's argument in light of the Supreme Court's recent clarification regarding the limited roles evidentiary hearings play in federal habeas proceedings. In *Cullen v. Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review."[6] 131 S. Ct. at 1398, 1400. Thus, for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). *See id.* at 1400 & n.7. This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d). *See id.* at 1402 n.11 ("[Petitioner] has failed to show that the [state court] unreasonably applied clearly established federal law on the record before that court, which brings our analysis to an end.") (internal citations omitted). We recognized this implication in *Stokley v. Ryan*, where we held that *Pinholster* "directly bar[red]" a petitioner's demand for an evidentiary hearing on an ineffective assistance claim

---

[6] *Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well. *See* § 2254(d)(2) (allowing for habeas relief if the state court decision "was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*.") (emphasis added); *Pinholster*, 131 S. Ct. at 1400 n.7 (comparing (d)(1) to (d)(2) and stating that (d)(1) "*also* is plainly limited to the state-court record.") (emphasis added).

because the new evidence could not be considered on habeas review. 659 F.3d 802, 807 (9th Cir. 2011).[7]

*Pinholster* and *Stokley* foreclose Gulbrandson's demands for evidentiary hearings in district court. His habeas claims for ineffective assistance based on counsel's alleged failures (1) to call Gulbrandson to testify at the guilt stage and (2) to develop Dr. Blinder's state of mind opinions at sentencing were adjudicated on the merits in state court proceedings. As described previously, *see supra* at II.C and II.D, the state court's rejections of these claims were neither contrary to, nor involved unreasonable applications, of *Strickland*. Thus, *Pinholster* bars a habeas court from any further factual development on these claims. *Pinholster*, 131 S. Ct. at 1411 n.20. As a result, the district court did not abuse its discretion by denying Gulbrandson's request for an evidentiary hearing regarding these claims. *See Stokley*, 659 F.3d at 809.

We similarly affirm the district court's denial of Gulbrandson's request for an evidentiary hearing regarding his claim that counsel was ineffective for failing to elicit an insanity opinion from Dr. Blinder. The state post-conviction court rejected this claim on the merits, holding that because Dr. Blinder was unwilling to render an opinion that Gulbrandson was insane, counsel was not ineffective in failing to obtain such an opinion. This decision was not

---

[7] Because *Pinholster* was decided after the oral argument in *Stokley* and "dramatically changed the aperture for consideration of new evidence," we alternatively held that petitioner was not entitled to an evidentiary hearing under pre-*Pinholster* law. *Stokley*, 659 F.3d at 809–14. We need not conduct such alternative analysis here, where the parties have had sufficient time to familiarize themselves with *Pinholster*, and discussed it at oral argument.

contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of facts.

The state court's determination that Dr. Blinder was unwilling to testify that Gulbrandson was legally insane was not an unreasonable determination of the facts. Neither Dr. Blinder's 1992 report nor his guilt phase testimony indicated a willingness to provide such an opinion. Dr. Blinder's silence on the issue of legal insanity is corroborated by State's counsel's statements to the trial judge during Dr. Blinder's testimony: "I've interviewed him. I've read his reports" and have determined that "[Dr. Blinder] is not giving an opinion as to the M'Naghten issue at the time of the crime."

Defense counsel's and Dr. Blinder's post-conviction affidavits provide further support for the state court's determination. Defense counsel's affidavit states that "[b]efore trial, Dr. Blinder repeatedly informed me that he was unwilling to render an opinion that Mr. Gulbrandson was M'Naghten insane at the time of the murder." This is consistent with Dr. Blinder's 1997 affidavit, which states that he would have testified that Gulbrandson's ability "to appreciate the nature and quality of his acts or to understand right from wrong" was "significantly affect[ed]." This still falls short of Arizona's definition of legal insanity at the time of trial, which required a showing that Gulbrandson did *not know* the nature and quality of his actions or that what he was doing was wrong. Ariz. Rev. Stat. § 13-502. Given this record, the state post-conviction court reasonably applied *Strickland* in holding that counsel was not ineffective for failing to obtain an insanity opinion that Dr. Blinder was not prepared to give. Thus, because Gulbrandson fails to meet the demands of § 2254(d) on the record before the state court,

the district court correctly denied an evidentiary hearing on this claim.

In sum, we conclude that the district court did not abuse its discretion by denying Gulbrandson's requests for evidentiary hearings on his various ineffective assistance claims.

## IV

In his state proceedings, Gulbrandson claimed that his Eighth Amendment rights were violated when impermissible victim impact evidence from Irene's family members was submitted to the sentencing judge. The Arizona Supreme Court, which provided the last reasoned opinion on this issue, rejected this claim because "trial judges are [assumed to be] capable of focusing on the relevant sentencing factors and ignore any 'irrelevant, inflammatory, and emotional' statements when making the sentencing decision." *Gulbrandson*, 906 P.2d at 599 (quoting *State v. Bolton*, 896 P.2d 830, 856 (Ariz. 1995)).

Gulbrandson argues that the rejection of his claim was an unreasonable application of Supreme Court precedent. He points to *Booth v. Maryland*, 482 U.S. 496 (1987). In *Booth*, the Supreme Court held that providing a jury with information about (1) a victim's "personal characteristics," (2) the "emotional trauma suffered by the family," *id.* at 502–03, and (3) "family members' opinions and characterizations of the crime," *id.* at 508, during the sentencing phase of a capital murder trial violated the defendant's Eighth Amendment rights. *Booth* explained that such information "can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant

evidence concerning the crime and the defendant." *Id.* This, in turn, "create[d] a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 503.**[8]** Gulbrandson claims that the Arizona Supreme Court's resolution of his claim was an unreasonable application of *Booth*.

We disagree. A state court's decision is not contrary to or an unreasonable application of Supreme Court precedent unless that precedent "squarely addresses the issue" or gives a "clear answer to the question presented" in the case before the state court. *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008); *see also Carey v. Musladin*, 549 U.S. 70, 77 (2006); *John-Charles v. California*, 646 F.3d 1243, 1248 (9th Cir. 2011) (explaining that the allegedly contravened Supreme Court precedent must be "closely on point"). In other words, "when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010) (en banc).

Such a "principled distinction" is present here: the Supreme Court cases that Gulbrandson relies on, *Payne* and *Booth*, involved a jury's consideration of victim impact evidence in capital sentencing. *See Payne*, 501 U.S. at 825 ("[A] State may properly conclude that for the *jury* to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing

---

**[8]** *Booth* was overruled in part by *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), which retreated from a per se rule barring admissibility of victim impact evidence regarding a victim's personal characteristics and a family's emotional trauma.

phase evidence of the specific harm caused by the defendant.") (emphasis added); *Booth*, 482 U.S. at 497 ("The question presented is whether the Constitution prohibits a *jury* from considering a 'victim impact statement' during the sentencing phase of a capital murder trial.") (emphasis added).

In this case, the challenged evidence was presented to a judge. We previously recognized this distinction in *Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011), where we held that *Booth*'s concern that victim impact statements would "inflame the jury" is "not the same when . . . a judge does the sentencing." *Id.* at 1055. As we have explained, courts "must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997); *Rhoades*, 638 F.3d at 1055.

Accordingly, because there is no Supreme Court case "squarely address[ing] the issue" whether a judge is barred from consideration of such victim impact evidence, it cannot be said that the Arizona Supreme Court unreasonably applied clearly established federal law when it denied Gulbrandson's Eighth Amendment claim. *Van Patten*, 552 U.S. at 125–26; *see also Knowles*, 556 U.S. at 122.

V

Gulbrandson also asks this court for authorization to file a second or successive petition for a writ of habeas corpus in the District of Arizona. *See* 28 U.S.C. § 2244(b)(3). We deny his request.

A

A petitioner seeking to bring a second or successive habeas corpus application "must make a prima facie showing that his application satisfies the requirements of § 2244(b)." *Pizzuto v. Blades*, 673 F.3d 1003, 1007 (9th Cir. 2012); 28 U.S.C. § 2244(b)(3)(C). Section 2244(b)(1) requires dismissal of claims "presented in a prior application." For claims not previously presented, section § 2244(b)'s "demanding standard," *Bible v. Schriro*, 651 F.3d 1060, 1063 (9th Cir. 2011) (per curiam), requires dismissal unless

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B) (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). Gulbrandson's application does not rest on a "new rule of constitutional law," so § 2244(b)(2)(A) is not applicable. Thus, to the extent Gulbrandson's proposed second or successive habeas petition raises claims not

previously presented, he "must make a prima facie showing of due diligence and actual innocence" as required by § 2244(b)(2)(B). *Morales v. Ornoski*, 439 F.3d 529, 531 (9th Cir. 2006).

B

Gulbrandson seeks to raise four claims based on a February 2009 report authored by Richard Kolbell, a neuropsychologist who examined Gulbrandson in May 2008. Among other things, Dr. Kolbell's report states that Gulbrandson's "neurocognitive test does reflect subtle, discrete, and relatively mild abnormality with respect to . . . impulse control."   Thus, according to Dr. Kolbell, Gulbrandson's capacity to "control his behavior [at the time of the murder] was significantly diminished, as a result of mental illness and, quite possibly, organically based deficits." In addition to these diagnoses, Dr. Kolbell also noted that it is "not possible to determine that point at which Mr. Gulbrandson might have or could have known that Ms. Katuran was, in fact, dead."

These statements form the centerpiece of the four claims in Gulbrandson's proposed second or successive petition. Two of the claims in the petition are based on Gulbrandson's assertion that Dr. Kolbell's report undermines the State's proof of premeditation, a required element for first-degree murder, by demonstrating that Gulbrandson "could not and did not premeditate" Irene's murder due to his various "neuropsychological and neurocognitive deficits." The other two claims in the proposed petition assert that Dr. Kolbell's opinion would have negated the aggravating circumstance that the murder was committed in an especially heinous or depraved manner due to Gulbrandson's use of gratuitous

violence. We deny Gulbrandson's application to file a second or successive petition because these claims were either raised in the previous habeas petition and are barred under § 2244(b)(1), or because they fail to meet § 2244(b)(2)(B)'s requirements.

C

We first address the two claims in Gulbrandson's proposed habeas petition that rely on the new mental health diagnoses adduced in Dr. Kolbell's report to challenge the state court's finding that the murder was premeditated. These are not new claims: Gulbrandson similarly argued in his previous habeas petition that the court's finding of premeditation was not supported by sufficient evidence. The district court determined that this claim was procedurally barred and that Gulbrandson could not establish any exceptions to the bar.

Although the challenge to the premeditation finding is not new, Gulbrandson does present new evidence (Dr. Kolbell's report) as additional support for his claims. But a claim "is successive if the basic thrust or gravamen of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments . . . [or] proved by different factual allegations." *Babbit v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) (internal quotation marks omitted); *see also Pizzutto*, 673 F.3d at 1008 ("[F]ederal courts will not consider new factual grounds in support of the same legal claim that was previously presented.") (internal quotation marks omitted). Here, Gulbrandson's prior habeas claim has the same "basic thrust or gravamen" as the two claims he seeks to bring in a second petition, namely, that the state court's finding of premeditation was constitutionally

erroneous. *See Morales*, 439 F.3d at 532 (denying claims in a second or successive petition that were "predicated on the same challenges [to the state court decision] that were previously considered" by the court). Accordingly, we deny Gulbrandson's application as to these claims because they were "presented in a prior application." § 2244(b)(1).

D

The two remaining claims in Gulbrandson's proposed petition challenge the state court's finding that the murder was committed in an especially heinous, cruel, or depraved manner. He argues that because Dr. Kolbell stated it was impossible to determine the point at which Gulbrandson might have known Irene was dead, Gulbrandson could not been guilty of using "gratuitous violence," which is defined under Arizona law as the infliction of excessive violence after the defendant knew or should have known that the victim was dead. *State v. Bocharski*, 189 P.3d 403, 421 (Ariz. 2008) (en banc).

These claims fail to meet the high standards of § 2244(b)(2)(B). First, Gulbrandson fails to make a prima facie showing that he could not have previously discovered the evidence in Dr. Kolbell's report through the exercise of due diligence. § 2244(b)(2)(B)(i). Gulbrandson's diligence is undermined by Dr. Kolbell's report itself, which states that "the mild deficits evident in the current examination *could have been identified*, perhaps to a more prominent degree, at the time of [Gulbrandson's] initial adjudication, had neuropsychological examination been undertaken at that time," (emphasis added). Thus, Gulbrandson's own expert confirms that this evidence could have been discovered at the time of trial. Yet Gulbrandson did not obtain it until some

sixteen and a half years after the trial and some twelve years after his state post-conviction proceedings. Because he provides "no legitimate justification" for why he could not obtain the information earlier, Gulbrandson has not demonstrated the diligence required under § 2244(b)(2)(B)(i). *Morales*, 439 F.3d at 533; *see also Bible*, 651 F.3d at 1064 (holding that a wait of ten years after an evidentiary request could have been brought was not diligent).

Second, Gulbrandson fails to make a prima facie showing that "no reasonable factfinder would have found" that the murder was committed in a heinous, cruel, or depraved manner. § 2244(b)(2); *see Pizzuto*, 673 F.3d at 1010. A reasonable factfinder could determine that his use of "several knives, scissors, and a wooden salad fork" on Irene and the "particularly gruesome, brutal, and protracted" fashion of the murder, *Gulbrandson*, 906 P.2d at 601, 604, were sufficient to show that Gulbrandson "should have known he had inflicted a fatal wound but continued nonetheless to inflict more violence," *Bocharski*, 189 P.3d at 422 (explaining that murders committed in a brief burst of rage with single weapons were less likely to involve gratuitous violence and citing *Gulbrandson* as an example to the contrary). This "unchallenged evidence provides a sufficient basis on which a reasonable factfinder could find [Gulbrandson] guilty" of using gratuitous violence and thus committing the murder in an especially heinous, cruel, or depraved manner. *Pizzuto*, 673 F.3d at 1009.

Because Gulbrandson has not been able to demonstrate either due diligence or actual innocence as to his claims that were not presented in his first habeas petition, his application to file a second or successive application for a writ of habeas corpus is denied. This denial is "not [] appealable and shall

not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E); *see also King v. Trujillo*, 638 F.3d 726, 733 (9th Cir. 2011).

VI

The district court's denial of Gulbrandson's habeas petition is **AFFIRMED**. His application to file a second or successive habeas petition is **DENIED**.

D.W. NELSON, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion in large part. My central disagreement concerns the claim that defense counsel failed to call Dr. Blinder during the penalty hearing to testify about Gulbrandson's state of mind at the time of the crime. This testimony would have rebutted the sole aggravating circumstance that made Gulbrandson eligible for the death penalty and would have provided crucial mitigating evidence. I would hold that the Arizona Supreme Court unreasonably determined the facts in denying Gulbrandson habeas relief and would remand for an evidentiary hearing on that basis. Therefore, I respectfully dissent.

My colleagues deny Gulbrandson's claim on the merits by concluding that Gulbrandson was not prejudiced by counsel's decision not to recall Dr. Blinder at sentencing because the evidence, if presented, would have been cumulative. Majority at 25–27. I cannot agree. We cannot determine whether Dr. Blinder's 1997 declaration is cumulative of the mental health evidence presented during the guilt phase of

trial, but it does not appear so.[1]  And a review of the record before the post-conviction court raises many questions about why counsel did not call Dr. Blinder during the sentencing hearing, making suspect the post-conviction court's resolution of this claim without any evidentiary development.

The post-conviction court had the following information before it when it denied Gulbrandson's petition:  (1) Dr. Blinder's 1992 pre-trial report, which did not mention the issue of *M'Naghten* insanity; (2) defense counsel's pre-trial statements to the trial court that Dr. Blinder would testify that the petitioner was *M'Naghten* insane; (3) Dr. Blinder's guilt phase testimony, during which counsel did not ask about, nor did Dr. Blinder testify to, *M'Naghten* insanity; (4) trial counsel's 1997 declaration that Dr. Blinder stated repeatedly *before* trial that he was unwilling to opine that the petitioner was *M'Naghten* insane at the time of the crime; and (5)

---

[1] The majority excerpts portions of Dr. Blinder's trial testimony to show that the opinions offered in his 1997 declaration were "essentially the same as the testimony adduced at trial."  Majority at 25–26.  This post-hoc analysis troubles me for two reasons.  First, even with Dr. Blinder's 1997 affidavit before us, we cannot know whether the testimony he would actually have offered during the sentencing phase would have been cumulative of his trial testimony.  Second, as a court of appeal, we are poorly situated to determine whether Dr. Blinder's 1997 affidavit is cumulative of his 1992 testimony—particularly without the benefit of expert opinions.  The majority finds the "cumulative nature of the 1997 affidavit" to be "readily apparent"; I think it quite otherwise.  Majority at 25.  But in any case, determining the salience of the distinctions between the opinions Dr. Blinder expressed in his 1992 testimony and report and those he would have expressed if he had been recalled at sentencing is the province of mental health experts, which highlights the core of my objection: that the state court denied this claim without holding an evidentiary hearing or making the factual determinations necessary to resolve it.

Dr. Blinder's 1997 declaration stating that he was willing, both at the time of trial and in 1997, to testify that the petitioner's mental illness significantly affected his ability to appreciate the nature and quality of his acts or to distinguish right from wrong, and that the petitioner was unable to conform his conduct to societal norms.

The post-conviction court denied Gulbrandson's ineffective assistance of counsel claim concerning counsel's failure to call Dr. Blinder at sentencing without an evidentiary hearing. The court reasoned that the mental health evidence presented during the guilt phase—that Gulbrandson had possibly experienced a dissociative/fugue state and suffered from bipolar disorder, alcoholism and a personality disorder—was before the trial court during the sentencing phase and did not need to be presented again. The state court also concluded that defense counsel believed at the time of trial that Dr. Blinder was unwilling to offer any testimony other than what he had put in his pre-trial report or testified to at trial, and thus that counsel's failure to elicit additional evidence at sentencing about petitioner's mental state was not ineffective assistance. The post-conviction court also held that there had been no prejudice.

The state court did not deny this ineffective assistance of sentencing counsel claim in a vacuum, however. The court also denied Gulbrandson's guilt-phase claim that trial counsel failed to elicit testimony that would have supported an insanity defense. In so doing, the court made a factual determination relevant to Gulbrandson's sentencing claims: The court concluded that even if Dr. Blinder had been willing to testify in 1997 that petitioner may have been *M'Naghten* insane at the time of the crime, he was not willing to offer that testimony at the time of trial. In reaching this

conclusion, the state court relied on Dr. Blinder's 1992 pre-trial report, which did not mention *M'Naghten* insanity.

But the post-conviction court also had before it Dr. Blinder's 1997 declaration, in which the doctor stated that he was willing to testify in 1997 *and at the time of trial* that Gulbrandson was "suffering from . . . mental illnesses . . . that would significantly affect his ability to appreciate the nature and quality of his acts or to understand right from wrong," and that he "was unable to conform his conduct to societal norms because of his mental disability." This testimony may have been insufficient to establish the version of *M'Naghten* insanity in effect in Arizona at the time of trial.[2] But the opinion expressed in Dr. Blinder's 1997 affidavit comes awfully close to the *M'Naghten* insanity standard, and surely would have been probative evidence at sentencing. *See* Ariz. Rev. Stat. § 13-703 (F)(6) & (G)(1) (1991) (listing as a statutory aggravating circumstance that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner" and as statutory mitigating factor "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."); *see also State v. Gretzler*, 659 P.2d 1, 10 (Ariz. 1983) (holding that "heinous and depraved go to the mental state and attitude of the perpetrator"). Yet the post-conviction court inexplicably

---

[2] Arizona law required a defendant asserting a *M'Naghten* insanity defense to prove that he was actually unable to understand the quality of his acts, not just significantly impaired in his ability to do so. *See* Ariz. Rev. Stat. § 13-502 (1991) (stating that *M'Naghten* insanity requires a showing that a person who was suffering from a mental disease or defect did "not know the nature and quality of the act, or if such person did know, that such person did not know that what he was doing was wrong").

failed to mention Dr. Blinder's 1997 affidavit. That is, the state court resolved the claim by relying on the absence of a reference to *M'Naghten* insanity in Dr. Blinder's 1992 pre-trial report, while completely ignoring Dr. Blinder's 1997 affidavit, which both averred that Gulbrandson suffered a mental impairment very similar to *M'Naghten* insanity and stated explicitly that Dr. Blinder was willing to offer that opinion at the time of trial. I find this conclusion utterly unreasonable.

My reading of the record convinces me that the post-conviction court implicitly adopted trial counsel's assertion that Dr. Blinder was unwilling to offer the testimony in his 1997 declaration at the time of trial. That finding, of course, is flatly belied by Dr. Blinder's 1997 affidavit. Hence, in denying Gulbrandson's claim of ineffective assistance of sentencing counsel, the state court must have done one of three things: (1) it ignored parts of Dr. Blinder's 1997 affidavit entirely; (2) it determined, without an evidentiary hearing, that trial counsel's 1997 declaration was more credible than Dr. Blinder's conflicting 1997 declaration; or (3) it determined, based solely on trial counsel's declaration and without the benefit of an evidentiary hearing, that although trial counsel originally intended to assert a *M'Naghten* insanity defense via Dr. Blinder's expert testimony, that strategy became infeasible by the time of trial because Dr. Blinder ultimately became unwilling to offer that testimony. Whichever factual finding underlies the state court's denial of Gulbrandson's claims, it was objectively unreasonable. It was unreasonable if the post-conviction court ignored Dr. Blinder's 1997 declaration, and it was equally unreasonable if the Court implicitly made an adverse credibility determination or resolved a factual dispute in the warden's favor without any evidentiary development.

The state court's decision is particularly problematic because there is reason to doubt Gulbrandson's trial counsel's version of the facts. The post-conviction court did not mention, and perhaps did not notice, that trial counsel's statements are internally contradictory. Before trial, counsel informed the trial court that the defenses were insanity and absence of intent, that Dr. Blinder examined Gulbrandson "to determine if, in fact, he was *M'Naghten* insane at the time of the event," and that trial counsel "would expect" Dr. Blinder's testimony to relate to *M'Naghten* insanity. That statement to the trial judge in 1992 contradicts counsel's 1997 declaration that Dr. Blinder repeatedly informed trial counsel that he was unwilling to render an opinion that Gulbrandson was *M'Naghten* insane at the time of the murder. There may well be an innocuous explanation involving changed circumstances that explains counsel's conflicting statements. But on the record as it existed before the state court, this glaring inconsistency seems to call counsel's credibility into question. And the post-conviction court's failure even to address the inconsistency is further evidence that it erred.

However it arrived at its conclusion that Dr. Blinder had nothing useful to add to the sentencing phase, the post-conviction court unreasonably determined the facts. Even though "we must be particularly deferential to our state-court colleagues," I remain "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding[s] [are] supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). In my view, "any appellate court to whom [these defects were] pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* The state court "overlooked or ignored evidence" that was "highly probative and central to petitioner's claim," which

"fatally undermine[d] the state fact-finding process, render[ing] the resulting finding[s] unreasonable." *Id.* at 1001.

Because I believe that the state court made an unreasonable determination of the facts, I also believe that its decision is not entitled to deference and that this claim presents a rare instance in which Gulbrandson is entitled to submit new evidence in federal court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011). Rather than resolve this claim on the merits, as the majority does, I would remand for an evidentiary hearing.

For these reasons, I respectfully dissent.